Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/06/2021 08:12 AM CDT

Gina Yagodinski, appellant,
v. Brad Sutton, appellee.
___ N.W.2d ___

Filed May 14, 2021.    No. S-20-317.

1. **Trial: Expert Witnesses: Appeal and Error.** There is no exact standard for fixing the qualifications of an expert witness, and a trial court is allowed discretion in determining whether a witness is qualified to testify as an expert. Unless the court's finding is clearly erroneous, such a determination will not be disturbed on appeal.

2. ____: ____: ____. An appellate court reviews de novo whether the trial court applied the correct legal standards for admitting an expert's testimony, and it reviews for abuse of discretion how the trial court applied the appropriate standards in deciding whether to admit or exclude an expert's testimony.

3. **Trial: Expert Witnesses.** Whether a witness is qualified as an expert is a preliminary question for the trial court.

4. **Health Care Providers: Expert Witnesses: Licenses and Permits: Juries.** A duly licensed and practicing chiropractor is competent to testify as an expert witness within the scope of his or her knowledge according to his or her qualifications in the field of chiropractics, and the weight to be accorded the testimony is for the jury.

5. **Health Care Providers: Expert Witnesses: Licenses and Permits.** A licensed chiropractor will generally be qualified to testify as an expert on any matter that is within the scope of chiropractic practice and licensure in Nebraska.

6. **Health Care Providers: Public Health and Welfare.** The general purpose of the Uniform Credentialing Act is to protect the public health, safety, and welfare by credentialing persons who provide health and health-related services, as well as developing and enforcing standards for such services.

7. **Health Care Providers: Statutes.** Whether a particular diagnosis, or diagnostic method, is within the authorized scope of chiropractic practice is primarily a question of statutory interpretation.

8. **Statutes: Legislature: Intent.** In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.

9. **Statutes: Appeal and Error.** To give effect to all parts of a statute, an appellate court will attempt to reconcile different provisions so they are consistent, harmonious, and sensible, and will avoid rejecting as superfluous or meaningless any word, clause, or sentence.

10. **Health Care Providers: Legislature: Courts.** The Legislature has circumscribed the diagnostic and treatment methods available to licensed chiropractors, and courts should not, by judicial interpretation, expand the practice of chiropractic beyond the scope established by the Legislature.

11. **Statutes: Words and Phrases.** Generally, when a statute does not define a term or phrase, courts will give the phrase its ordinary meaning.

12. **Health Care Providers.** The diagnostic methods described in Neb. Rev. Stat. § 38-805(1)(a) (Reissue 2016) are necessarily confined to assessing patients for the purpose of determining appropriate chiropractic care.

13. **Health Care Providers: Expert Witnesses: Licenses and Permits: Legislature: Courts.** When an expert is a licensed health professional offering testimony about a patient, it is entirely appropriate for a court to consider, as a factor affecting qualification, the statutory scope of practice established by the Legislature.

14. **Health Care Providers.** A licensed chiropractor cannot expand the scope of chiropractic practice in Nebraska merely through additional education, training, and professional affiliation.

15. **Health Care Providers: Legislature.** The scope of chiropractic practice has been established by the Legislature, and only that body has the authority to expand it.

16. **Health Care Providers: Expert Witnesses: Licenses and Permits.** When a licensed, credentialed health professional seeks to offer an expert opinion regarding a patient's diagnosis, it is entirely appropriate to limit such expert testimony to matters within the scope of the expert's professional licensure and credentialing.

Appeal from the District Court for Sarpy County: George A. Thompson, Judge. Affirmed.

James E. Harris and Britany S. Shotkoski, of Harris & Associates, P.C., L.L.O., for appellant.

Thomas A. Grennan and Eric J. Sutton, of Gross & Welch, P.C., L.L.O., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Stacy, J.

The primary question in this appeal is whether a licensed chiropractor in Nebraska was qualified to offer expert opinion testimony that his patient sustained a traumatic brain injury in a motor vehicle collision. The district court excluded such opinion testimony on several grounds, including that the opinion was outside the scope of chiropractic practice and licensure in Nebraska. We affirm.

## I. BACKGROUND

In 2011, Gina Yagodinski's vehicle was struck from behind by a vehicle operated by Brad Sutton. In 2015, Yagodinski filed a lawsuit against Sutton in the district court for Douglas County. Her operative complaint alleged the collision was caused by Sutton's negligence and resulted in Yagodinski's sustaining "permanent and painful injuries which have been diagnosed as persistent/recurrent neck, thoracic and spine pain, and headaches." The complaint sought to recover both special and general damages. Eventually, Yagodinski dropped her claim for special damages and proceeded to trial seeking only general damages.

During the pendency of this action, Yagodinski was referred to Dr. John McClaren, a licensed chiropractor in La Vista, Nebraska. McClaren examined Yagodinski and diagnosed her with "vestibular post-concussive syndrome," which he concluded was caused by the 2011 collision. The parties generally describe this diagnosis as an opinion that Yagodinski sustained a mild traumatic brain injury in the collision.

The defense moved in limine to preclude McClaren from offering any opinion testimony regarding his diagnosis of a traumatic brain injury, arguing generally that such

testimony was inadmissible under the Nebraska Evidence Rules and the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[1] and *Schafersman v. Agland Coop*[2] (*Daubert/Schafersman*). At the hearing on the motion in limine, both parties offered evidence, which we summarize briefly now and discuss in more detail later.

Yagodinski offered evidence that in addition to McClaren's chiropractic education and training, he pursued specific education and training in the diagnosis of traumatic brain injury, and that he holds himself out as a "chiropractic neurologist." The defense offered evidence from a licensed medical neurologist that the methods used by McClaren to diagnose traumatic brain injury were not generally accepted by medical neurologists.

In a written order, the trial court sustained the motion in limine and precluded McClaren from testifying that Yagodinski sustained a traumatic brain injury in the collision. Citing to this court's opinions in *Floyd v. Worobec*[3] and *Fries v. Goldsby*,[4] the court generally reasoned that McClaren, as a licensed chiropractor, was qualified to testify to matters within the scope of his chiropractic licensure. But the court found McClaren was not qualified to testify about the diagnosis and treatment of traumatic brain injuries, reasoning that such injuries were outside the scope of chiropractic care in Nebraska. The court also found that McClaren's diagnosis of traumatic brain injury was inadmissible under *Daubert/Schafersman*.

Yagodinski moved the court to reconsider its ruling and to allow McClaren to offer his opinion that Yagodinski sustained a traumatic brain injury in the collision. The court overruled that request, and the matter proceeded to a jury trial.

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

[2] *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

[3] *Floyd v. Worobec*, 248 Neb. 605, 537 N.W.2d 512 (1995).

[4] *Fries v. Goldsby*, 163 Neb. 424, 80 N.W.2d 171 (1956).

## 1. Trial

At trial, in addition to her own testimony, Yagodinski offered the testimony of her parents, a coworker, and her husband. These witnesses testified, summarized, that Yagodinski was athletic and active before the collision, but experienced pain and discomfort after the collision and was generally less active.

Both parties offered expert testimony at trial. Yagodinski called McClaren, who testified that Yagodinski was referred to him approximately 5½ years after the collision. McClaren obtained a history from Yagodinski and reviewed her prior treatment records which, according to McClaren, showed that she reported neck stiffness and headaches a few hours after the collision. McClaren testified those symptoms improved with chiropractic physiotherapy, but Yagodinski continued to experience headaches, neck pain, and back pain. Based on his experience, education, and training, McClaren opined to a reasonable degree of chiropractic certainty that Yagodinski sustained cervical whiplash injuries as a result of the collision and that her residual symptoms were permanent.

At the conclusion of McClaren's testimony, and outside the presence of the jury, Yagodinski's counsel made an offer of proof. The judge left the courtroom during the offer of proof, with the parties' consent. Counsel for Yagodinski made a record that, if permitted, McClaren would have testified about the diagnostic tests he performed on Yagodinski and would have offered his opinion that she sustained a mild traumatic brain injury caused by the 2011 collision. Defense counsel objected to the offer of proof, and both parties offered exhibits to support their respective positions. The trial record contains no rulings on the offer of proof.

When trial resumed, the defense offered the deposition testimony of Dr. Joel Cotton, who described himself as a physician and board-certified neurologist practicing in Nebraska. Cotton testified that he reviewed Yagodinski's hospital and medical records, her acupuncture and massage records, and

her chiropractic records. He also reviewed records from the sports club where Yagodinski participated in kickboxing and some of her employment records. Based on his review of those records and his training, knowledge, and experience, Cotton opined to a reasonable degree of medical certainty that Yagodinski experienced a "temporary cervical sprain or strain" as a result of the collision, but did not suffer any permanent injury. In Cotton's opinion, Yagodinski reached maximum medical improvement within about 2 months after the collision, and any treatment she sought after that point was unrelated to the collision.

The jury returned a general verdict in favor of Yagodinski in the amount of $5,000. The trial court entered judgment in that amount the following day.

### 2. FIRST APPEAL

Yagodinski appealed the judgment, assigning error to the trial court's exclusion of McClaren's diagnosis regarding mild traumatic brain injury. The appellate briefing generally treated the offer of proof as though it had been considered and overruled by the trial court, but in an unpublished memorandum opinion, we found the record did not support such an assumption. We expressed concern that the judge's absence from the courtroom during the offer of proof prevented a ruling on the offer and defeated a primary purpose of the exercise, which was to provide the trial court an opportunity to reconsider its preliminary evidentiary ruling in the context of all the evidence.[5]

---

[5] See, *State v. Huston*, 285 Neb. 11, 824 N.W.2d 724 (2013) (after preliminary evidentiary ruling, requiring renewal of objection and offer of proof at trial provides important procedural safeguards against reversible error); *State v. Kramer*, 238 Neb. 252, 469 N.W.2d 785 (1991) (purpose of offer of proof is to bring attention to substance and purpose of proffered evidence so both trial court and appellate court can determine whether exclusion of evidence was error).

We also explained that an appellate court reviews for an abuse of discretion a trial court's ruling on whether to admit or exclude expert testimony[6] and that we were not able to conduct such a review because we could not tell from the record whether a ruling had been made on the offer of proof and, if so, the basis for such ruling. We therefore reversed, and remanded with instructions that the court make the necessary rulings to facilitate appellate review. Specifically, we directed:

> Upon remand, the court shall determine whether McClaren is qualified as an expert and if so, whether the proffered opinions are within the scope of that expertise. If so, the district court shall determine, on the existing record, whether the excluded testimony, in whole or in part, is scientifically valid and reliable under the *Daubert/Schafersman* analysis. . . . If, after making the necessary specific findings, the court concludes that none of McClaren's excluded testimony is admissible, the court shall reinstate the judgment upon the jury's verdict. If the court concludes that any or all of the excluded testimony is admissible, the court shall order a new trial only on the issue of damages.

### 3. Proceedings on Remand

On remand, the trial court received into evidence the exhibits previously offered in support of, and in opposition to, Yagodinski's offer of proof. Additionally, it received the entire bill of exceptions from trial and it took judicial notice of the Nebraska statutes and administrative regulations governing chiropractic licensure, and the scope of chiropractic practice, in Nebraska. As relevant to the issues on appeal, we summarize the evidence considered by the trial court on remand.

### (a) McClaren's Deposition and Affidavit

In his discovery deposition, McClaren described himself as "a board-certified chiropractic neurologist." He obtained

---

[6] See *Larsen v. 401 Main St.*, 302 Neb. 454, 923 N.W.2d 710 (2019).

this certification in 2005 through the American Chiropractic Neurology Board, which required a minimum of 300 hours of postgraduate education in neurology and a board examination. To obtain the required education in neurology, McClaren attended the Carrick Institute; an affidavit from Dr. Frederick Carrick was received as part of Yagodinski's offer of proof and is discussed later. In 2014, McClaren performed clinical rounds at the Carrick Brain Center, and in 2015, McClaren completed a 375-hour fellowship degree in "Brain Injury and Rehabilitation" from the American Board of Brain Injury and Rehabilitation.

McClaren testified that to diagnose Yagodinski's brain injury, he performed a series of optical examinations using various instruments, including a saccadometer. McClaren described the saccadometer as a "headgear with a laser" that "measures the amplitude, latency, and position of the eye when it moves." He also performed "static visual acuity test[s]," which he described as tests "you would do at the conventional eye doctor," and he used a tablet computer to administer "a neuropsychological battery" developed by the Cleveland Clinic to diagnose concussion. McClaren represented that all the testing methodologies and devices he used were "formulated for medical purposes," and he described it as "standard testing that's done by medical professionals and allied health professionals." McClaren testified that his testing showed Yagodinski had "issues with the visual motor system compared to the vestibular system" and the "eye movements in her dynamic visual acuity weren't appropriate with someone who has perfect neurology in those areas." Based on the results of his testing of Yagodinski, his training, and his education, McClaren diagnosed Yagodinski with "vestibular post-concussive syndrome," a condition McClaren described as a mild traumatic brain injury. McClaren opined to a reasonable degree of chiropractic probability that the condition was caused by the 2011 collision. McClaren was not asked whether he provided any chiropractic treatment to address Yagodinski's brain injury,

nor did he testify that chiropractic treatment could address such an injury. McClaren testified that he occasionally refers chiropractic patients to medical neurologists, but he did not consider such a referral for Yagodinski.

### (b) Affidavit of Carrick

To support McClaren's qualification as an expert in traumatic brain injuries, Yagodinski also offered the affidavit of Carrick, who described himself as a "board-certified chiropractic neurologist and a board-certified fellow in several specialties related to neurology, brain injuries, and rehabilitation in both the United States and Europe." It was Carrick's opinion that "Chiropractic Physicians in the state of Nebraska who are board-certified in Neurology are qualified and able to provide opinions and treatment to patients who have suffered a traumatic brain injury."

### (c) Affidavit of Lorn Miller

Yagodinski also offered the affidavit of Dr. Lorn Miller, who described himself as a "medical doctor and board-certified neurologist." Miller averred that he is familiar with the academic credentials for chiropractic neurology and that he "recognize[d] [McClaren's] expertise and bona fide specialty training in his profession as a chiropractic neurologist and his interdisciplinary certification, qualifications, training and expertise in traumatic brain injury and rehabilitation." Miller also offered the opinion that McClaren was qualified to render an opinion that Yagodinski sustained a concussion and has vestibular postconcussion syndrome.

### (d) Deposition and Affidavit of Cotton

The defense opposed Yagodinski's offer of proof by offering the affidavit of Cotton and portions of his deposition testimony that had been redacted for use at trial. Cotton testified that he observed nothing in Yagodinski's medical or chiropractic records to suggest she sustained a traumatic brain injury in the 2011 collision. Cotton also testified that he reviewed

McClaren's report of the diagnostic methods McClaren used to diagnose Yagodinski with a brain injury and that in Cotton's opinion, McClaren's report made "absolutely no sense." Cotton generally averred that McClaren's testing and conclusions were unreliable, and Cotton specifically averred that the ocular tests McClaren used to diagnose Yagodinski's concussion were not generally accepted within the neurological community or among medical neurologists.

### 4. Ruling on Offer of Proof

In a lengthy order, the trial court discussed the offer of proof evidence considered on remand and made specific findings under the *Daubert/Schafersman* framework. The court found that diagnosing a brain injury is "outside the qualifications and expertise of a chiropractor" under the Nebraska statutes governing the scope of chiropractic practice. It further found that McClaren's diagnostic methodology, including the use of various optical devices, fell outside the scope of chiropractic practice. The court acknowledged McClaren's additional education and training in traumatic brain injuries, but concluded it did not enable McClaren to testify as an expert on matters that were beyond the scope of chiropractic practice in Nebraska. The court also analyzed McClaren's methodology and reasoning under *Daubert/Shafersman* and concluded it was neither scientifically valid nor reliable.

The trial court therefore overruled the offer of proof and confirmed its finding that McClaren's proffered opinion diagnosing a traumatic brain injury was inadmissible. The court reinstated the judgment on the jury's verdict, and Yagodinski again appealed. We moved the case to our docket on our own motion.

### II. ASSIGNMENTS OF ERROR

Yagodinski assigns multiple errors, which we consolidate and restate into one: The trial court erred when it restricted the scope of McClaren's expert testimony to exclude his

opinion that Yagodinski sustained a traumatic brain injury in the 2011 collision.

### III. STANDARD OF REVIEW

[1] There is no exact standard for fixing the qualifications of an expert witness, and a trial court is allowed discretion in determining whether a witness is qualified to testify as an expert.[7] Unless the court's finding is clearly erroneous, such a determination will not be disturbed on appeal.[8]

[2] An appellate court reviews de novo whether the trial court applied the correct legal standards for admitting an expert's testimony, and it reviews for abuse of discretion how the trial court applied the appropriate standards in deciding whether to admit or exclude an expert's testimony.[9]

### IV. ANALYSIS

Neb. Evid. R. 702 governs the admissibility of expert testimony and provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."[10] Under rule 702, "a witness can testify concerning scientific, technical, or other specialized knowledge only if the witness is qualified as an expert."[11]

[3] Whether a witness is qualified as an expert is a preliminary question for the trial court.[12] Here, the trial court found that McClaren, a licensed chiropractor in Nebraska, was qualified to offer an expert opinion that his patient sustained

---

[7] *State v. Daly*, 278 Neb. 903, 775 N.W.2d 47 (2009). See, also, *Carlson v. Okerstrom*, 267 Neb. 397, 675 N.W.2d 89 (2004).

[8] *Daly, supra* note 7.

[9] *Larsen, supra* note 6.

[10] Neb. Rev. Stat. § 27-702 (Reissue 2016).

[11] *Carlson, supra* note 7, 267 Neb. at 409, 675 N.W.2d at 102.

[12] *Id.*

a cervical whiplash injury in the collision, but was not quali-fied to offer an expert opinion that she sustained a traumatic brain injury.

In this appeal, Yagodinski's arguments regarding McClaren's qualifications fall into two general categories. First, she argues the statutory scope of chiropractic practice in Nebraska is broad enough to include the diagnosis of traumatic brain injury, using the diagnostic methods employed by McClaren. Second, she argues that McClaren is a "chiropractic neurologist" with specialized education and training in the diagnosis of traumatic brain injuries, and therefore is qualified to testify as an expert on brain injuries. We address these arguments in order.

### 1. Scope of Chiropractic Practice and Diagnostic Methods Used by McClaren

[4,5] It is well settled that "a duly licensed and practicing chiropractor is competent to testify as an expert witness within the scope of his [or her] knowledge according to his [or her] qualifications in the field of chiropractics, and the weight of his [or her] testimony is a question for the jury."[13] As such, a licensed chiropractor will generally be qualified to testify as an expert on any matter that is within the scope of chiropractic practice and licensure in Nebraska.[14]

As it regards McClaren's qualification to offer expert tes-timony that his patient sustained a traumatic brain injury, the primary question is whether such a diagnosis falls within the scope of chiropractic practice.[15] To answer that question, we

---

[13] *Fries, supra* note 4, 163 Neb. at 435, 80 N.W.2d at 178. See, also, *Floyd, supra* note 3 (licensed chiropractor qualified to testify to matters within scope of such practice); *Rodgers v. Sparks*, 228 Neb. 191, 421 N.W.2d 785 (1988) (licensed chiropractor may testify as expert witness within scope of qualifications in field of chiropractic).

[14] See *id.*

[15] See *Rodgers, supra* note 13, 228 Neb. at 197, 421 N.W.2d at 789 (framing qualification determination as "whether [expert opinions on] causation and permanency are within the scope of the field of chiropractic").

turn first to the legislative acts which govern the practice of chiropractic in Nebraska.

The practice of chiropractic in Nebraska has been statutorily regulated for almost a century.[16] Before the enactment of laws providing for chiropractic licensure and regulation, professionals practicing chiropractic were considered to be engaged in the unauthorized practice of medicine.[17] Currently, the Legislature regulates the scope of chiropractic practice through the Uniform Credentialing Act[18] and the Chiropractic Practice Act.[19] There is considerable variation in the way each state defines the scope of chiropractic practice, so opinions from other jurisdictions offer only limited guidance when considering the scope of chiropractic in Nebraska.[20]

[6] The Legislature has explained the general purpose of the Uniform Credentialing Act is to protect the public health, safety, and welfare by credentialing persons who provide health and health-related services, as well as developing and enforcing standards for such services.[21] The Uniform Credentialing Act governs more than 30 different health-related professions,[22] including chiropractors.[23] As a general matter,

---

[16] See 1927 Neb. Laws, ch. 167 § 76, p. 474.

[17] See *Harvey v. State*, 96 Neb. 786, 148 N.W. 924 (1914) (affirming chiropractor's conviction for unauthorized practice of medicine, noting Nebraska Legislature had not enacted laws providing for the licensure and regulation of chiropractors).

[18] See Neb. Rev. Stat. §§ 38-101 to 38-1,145 (Reissue 2016 & Cum. Supp. 2020).

[19] See Neb. Rev. Stat. §§ 38-801 to 38-811 (Reissue 2016 & Cum. Supp. 2020).

[20] See, generally, 78 Am. Jur. *Trials* 1, § 5 (2001) (observing considerable variation among 50 states in statutory scope of allowable chiropractic practice; some statutes narrowly restrict chiropractic practice and others authorize using range of diagnostic and treatment methods in addition to spinal manipulation).

[21] See § 38-103.

[22] See, generally, § 38-121(1).

[23] See §§ 38-101(7) and 38-121(1)(i).

credentialed health professionals may not practice beyond the authorized scope of their profession.[24]

In Nebraska, the statutory scope of chiropractic practice has changed over the years,[25] and currently, it is defined in § 38-805 of the Chiropractic Practice Act, which provides:

(1) Practice of chiropractic means one or a combination of the following, without the use of drugs or surgery:

(a) The diagnosis and analysis of the living human body for the purpose of detecting ailments, disorders, and disease by the use of diagnostic X-ray, physical and clinical examination, and routine procedures including urine analysis; or

(b) The science and art of treating human ailments, disorders, and disease by locating and removing any interference with the transmission and expression of nerve energy in the human body by chiropractic adjustment, chiropractic physiotherapy, and the use of exercise, nutrition, dietary guidance, and colonic irrigation.

Additionally, the Chiropractic Practice Act expressly excludes "[l]icensed physicians and surgeons" and "licensed osteopathic physicians" who are exclusively engaged in the practice of their respective professions.[26] Conversely, the Medicine and Surgery Practice Act[27] excludes chiropractors from the class of persons who engage in the unauthorized practice of medicine, so long as the chiropractor is "licensed and practicing under the Chiropractic Practice Act."[28]

---

[24] See, e.g., §§ 38-178(6)(b) and 38-179. See, also, 172 Neb. Admin. Code ch. 29, § 007.02(C) (2020).

[25] Compare § 38-805, with Neb. Rev. Stat. § 71-177 (1943) (defining "practice of chiropractic" as "[p]ersons publicly professing to be chiropractors" and "[p]ersons who treat human ailments by the adjustment by hand of any articulation of the spine").

[26] § 38-806.

[27] See Neb. Rev. Stat. §§ 38-2001 to 38-2062 (Reissue 2016 & Cum. Supp. 2020).

[28] § 38-2025(13).

We understand Yagodinski to argue that McClaren's diagnosis of a traumatic brain injury falls within the scope of chiropractic practice because § 38-805 contains no language expressly restricting the practice of chiropractic to only certain areas of the body, and it does not expressly restrict the types of ailments, disorders, and diseases that chiropractors can diagnose. Yagodinski also appears to argue that § 38-805 does not purport to restrict the methods or equipment a chiropractor can use to reach a diagnosis. In other words, Yagodinski generally argues that chiropractors are authorized to diagnose human disease without limitation. The trial court rejected such a broad interpretation of § 38-805, and we do too.

[7-9] Whether a particular diagnosis, or diagnostic method, is within the authorized scope of chiropractic practice is primarily a question of statutory interpretation.[29] In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.[30] To give effect to all parts of a statute, an appellate court will attempt to reconcile different provisions so they are consistent, harmonious, and sensible, and will avoid rejecting as superfluous or meaningless any word, clause, or sentence.[31]

Yagodinski is correct that § 38-805 does not expressly limit the areas of the body or the types of ailments that a licensed chiropractor can diagnose and treat. Nor does it expressly prohibit the use of any particular method or equipment when making a diagnosis. But the plain language of § 38-805 imposes

---

[29] See Annot., 16 A.L.R.4th 58, § 2[b] (1982) (whether particular practice or procedure is within authorized scope of chiropractic is primarily question of statutory interpretation and normal rules of construction apply).

[30] *Anderson v. A & R Ag Spraying & Trucking*, 306 Neb. 484, 946 N.W.2d 435 (2020).

[31] See *E.M. v. Nebraska Dept. of Health & Human Servs.*, 306 Neb. 1, 944 N.W.2d 252 (2020).

such limitations indirectly by restricting the diagnostic and treatment methods that licensed chiropractors can use.

Subsection (1)(a) of § 38-805 restricts the diagnostic methods a chiropractor can use to detect ailments, disorders, and disease, and subsection (1)(b) restricts the treatment methods a chiropractor can use. By restricting both the diagnostic and treatment methods available to licensed chiropractors, the Legislature has necessarily restricted the universe of ailments, disorders, and diseases such professionals can diagnose and treat within the scope of chiropractic practice.[32] Stated differently, when defining the scope of chiropractic practice under § 38-805(1)(a), the Legislature has authorized a licensed chiropractor to diagnose only those human ailments, disorders, or diseases that can be detected "by the use of diagnostic X-ray, physical and clinical examination, and routine procedures including urine analysis." And under § 38-805(1)(b), the Legislature has authorized a licensed chiropractor to treat only those human ailments, disorders, and diseases which can be addressed by "locating and removing any interference with the transmission and expression of nerve energy in the human body by chiropractic adjustment, chiropractic physiotherapy, and the use of exercise, nutrition, dietary guidance, and colonic irrigation." By way of comparison, the Legislature has placed no statutory restrictions on the diagnostic methods or the treatment methods physicians can use, and it has defined the practice of medicine and surgery broadly to

---

[32] Compare limited diagnostic and treatment methods under § 38-805(1)(a), with § 38-2024(2), (3), and (5) (broadly defining practice of medicine and surgery to include persons "who prescribe and furnish medicine for some illness, disease, ailment, injury, pain, deformity, or any physical or mental condition, or treat the same by surgery"; persons "qualified in the diagnosis or treatment of diseases, ailments, pain, deformity, or any physical or mental condition, or injuries of human beings"; and persons who "maintain an office for the examination or treatment of persons afflicted with ailments, diseases, injuries, pain, deformity, or any physical or mental condition of human beings").

include "the diagnosis or treatment of diseases, ailments, pain, deformity, or any physical or mental condition, or injuries of human beings."[33]

[10] We must reject Yagodinski's invitation to interpret § 38-805 so broadly that it permits licensed chiropractors to diagnose all human conditions without limitation. Such a construction would ignore the statutory restrictions placed on the diagnostic methods a chiropractor can use and would expand the authorized diagnostic methods to be commensurate with licensed physicians and surgeons. The Legislature has circumscribed the diagnostic and treatment methods available to licensed chiropractors, and courts should not, by judicial interpretation, expand the practice of chiropractic beyond the scope established by the Legislature.[34]

The plain language of § 38-805(1)(a) authorizes chiropractors to use only certain diagnostic methods: "diagnostic X-ray, physical and clinical examination, and routine procedures including urine analysis." The trial court determined the methods used by McClaren to diagnose Yagodinski's traumatic brain injury fell outside the statutory scope of chiropractic practice. As we explain, on this record, we see no error in that finding.

[11] We have been directed to no statute purporting to more specifically define the permissible diagnostic methods described in § 38-805(1)(a). Generally speaking, when a statute does not define a term or phrase, courts will give the phrase its ordinary meaning,[35] and we do so here. But we

---

[33] § 38-2024(3).

[34] See *State, ex rel. Iowa Dept. of Health v. Van Wyk*, 320 N.W.2d 599 (Iowa 1982). See, also, *Atty. Gen., on Behalf of People v. Beno*, 422 Mich. 293, 312, 373 N.W.2d 544, 552 (1985) (observing "public health and safety is best protected by more strictly construing the jurisdiction of the more specialized and limited health profession in favor of the more comprehensively trained and licensed profession").

[35] See *Hall v. United States*, 566 U.S. 506, 132 S. Ct. 1882, 182 L. Ed. 2d 840 (2012).

also find instructive the administrative regulations adopted by the Department of Health and Human Services which more directly address both the diagnostic methods chiropractors can use and the purpose of such methodologies.[36]

[12] Consistent with the diagnostic methods described generally in § 38-805, the regulations of the Department of Health and Human Services provide that a chiropractor's diagnostic methods "may include, but are not limited to, urine and blood analysis and diagnostic imaging."[37] To the extent § 38-805(1)(a) also authorizes chiropractors to use "physical and clinical examination" as a diagnostic method, the regulations explain that the purpose of such clinical evaluations is to "assess[] the patient's current health status or identify if the patient is a *proper subject for chiropractic care*."[38] As such, the diagnostic method of "physical and clinical examination" described in § 38-805(1)(a) is necessarily confined to assessing patients for the purpose of determining appropriate chiropractic care.[39] Were the scope of chiropractic practice not so confined, licensed chiropractors would arguably be subject to malpractice liability anytime they failed to diagnose a patient's medical condition or injury, regardless of whether such condition or injury can be treated with chiropractic care.[40]

---

[36] See 172 Neb. Admin. Code ch. 29, § 008 (2020).

[37] *Id.*

[38] *Id.* (emphasis supplied).

[39] See, *id.*; § 38-805(1)(a).

[40] See, e.g., *Goldstein v. Janusz Chiropractic Clinics*, S.C., 218 Wis. 2d 683, 582 N.W.2d 78 (Wis. App. 1998) (explaining chiropractor not subject to malpractice for failure to diagnose abnormal lung mass because chiropractors are confined to their limited scope of chiropractic practice). See, also, *Braford v. O'Connor Chiropractic Clinic*, 243 Mich. App. 524, 624 N.W.2d 245 (2000) (observing scope of chiropractic care, and chiropractor's standard of care, are two sides of same coin; the former identifies what chiropractors are permitted to do, and the latter establishes what chiropractors must do).

The conclusion that the statutorily authorized diagnostic methods should not be used to expand the scope of chiropractic is further supported by the statutory directive in § 38-805(2):

> The use of X-rays beyond the axial skeleton as described in [§ 38-805(1)(a)] shall be solely for diagnostic purposes and shall not expand the practice of chiropractic to include the treatment of human ailments, disorders, and disease not permitted when the use of X-rays was limited to the axial skeleton.

Here, the record contains no evidence that when diagnosing Yagodinski with a traumatic brain injury, McClaren used any of the diagnostic methods described in and authorized by § 38-805(1)(a). Instead, Yagodinski describes that the diagnostic methods used by McClaren included "certain optical examinations," "the use of a saccadometer," "a neuropsychological battery, a dynamic visual test[,] and other digital tests utilized in concussion baseline and diagnosis."[41] She contends that all the diagnostic testing methods used by McClaren are generally accepted and used in the medical community to diagnose brain injuries.

We express no opinion on whether these testing methods are generally accepted and used in the medical community to diagnose brain injuries because that issue is not before us. The question we must answer is whether licensed chiropractors are authorized to use such methods in diagnosing patients. We see nothing in the record supporting such a conclusion. Obviously, optical tests, saccadometers, and neuropsychological batteries are not among the diagnostic methods authorized in § 38-805. And we see nothing in the record that would support the conclusion that the optical tests and neuropsychological batteries used by McClaren to reach his diagnosis were administered for the purpose of assessing whether Yagodinski was a proper subject for chiropractic

---

[41] Brief for appellant at 32.

care.[42] Absent such evidence, we see no clear error in the trial court's finding that the diagnostic methods used by McClaren to reach his diagnosis of traumatic brain injury fell outside the scope of chiropractic practice.[43]

[13] In sum, when an expert is a licensed health professional offering testimony about a patient, it is entirely appropriate for a court to consider, as a factor affecting qualification, the statutory scope of practice established by the Legislature.[44] The district court here applied the correct legal standard to determine whether McClaren was qualified to offer an expert opinion on traumatic brain injury, and it did not abuse its discretion in excluding the proffered diagnosis on the basis that McClaren's diagnostic methods fell outside the scope of chiropractic practice in Nebraska.

## 2. ADDITIONAL EDUCATION AND TRAINING CANNOT EXPAND SCOPE OF CHIROPRACTIC PRACTICE

In arguing that the district court should have found McClaren was qualified to testify that Yagodinski suffered a traumatic brain injury, Yagodinski relies heavily on the facts that, in addition to the standard chiropractic education and licensure, McClaren has over 600 hours of education and training focused on traumatic brain injury and holds himself out as

---

[42] See 172 Neb. Admin. Code ch. 29 § 008.

[43] See *State, ex rel. Iowa Dept. of Health, supra* note 34, 320 N.W.2d at 601 (affirming that methods used by chiropractor fell "outside the ambit of those chiropractic functions contemplated or allowed by statute").

[44] See, *Floyd, supra* note 3 (finding no abuse of discretion in excluding expert testimony from witness who had pre-med education, graduated from chiropractic college, and had hundreds of hours of additional education in "applied kinesiology," when evidence did not show witness was actually licensed to practice chiropractic); *Rodgers, supra* note 13, 228 Neb. at 197, 421 N.W.2d at 789 (framing expert qualification question as whether proffered opinion of licensed chiropractor was "within the scope of the field of chiropractic").

a board-certified "chiropractic neurologist." Yagodinski relies on the general principle that expert witnesses "'will be considered qualified if, and only if, they possess special skill or knowledge respecting the subject matter involved so superior to that of persons in general as to make the expert's formation of a judgment a fact of probative value.'"[45]

Yagodinski concedes that McClaren is not licensed to practice medicine, but she argues that his "chiropractic education, training and practice in orthopaedics and neurology utilize the same medical texts and literature to diagnose and analyze the human body as utilized in medical schools."[46] Additionally, she argues that McClaren's "graduate and post-graduate educational curriculum consisted of medical texts and literature authored by medical doctors"[47] and that in reaching his diagnosis of mild traumatic brain injury, he applied diagnostic methods used by medical doctors and relied on peer-reviewed "medical literature from renowned institutions such as Harvard Medical School."[48] Yagodinski thus concludes that "McClaren possesses special skills and knowledge so superior to persons in general [that he is] unequivocally qualified to testify as an expert in chiropractic neurology."[49]

We have been directed to nothing in the applicable statutes or regulations that defines the practice of "chiropractic neurology" or that recognizes such a subspecialty in Nebraska. But regardless, there is a more fundamental problem with Yagodinski's argument: It rests on the faulty assumption that the scope of chiropractic practice in Nebraska is something a chiropractor can expand through additional education and

---

[45] *Carlson, supra* note 7, 267 Neb. at 409, 675 N.W.2d at 102, quoting *Ashby v. First Data Resources*, 242 Neb. 529, 497 N.W.2d 330 (1993).

[46] Brief for appellant at 34.

[47] *Id.* at 16.

[48] *Id.* at 32.

[49] *Id.* at 39.

training. But no amount of additional education will qualify a licensed chiropractor to offer expert testimony about a patient that is outside the scope of chiropractic practice in Nebraska, absent additional licensure and credentialing.

[14,15] This opinion should not be understood as expressing skepticism or criticism of McClaren's education, training, or specialized knowledge as it relates to neurology or traumatic brain injury. But we must soundly reject the suggestion that a licensed chiropractor can expand the scope of chiropractic practice in Nebraska merely through additional education, training, and professional affiliation. The scope of chiropractic practice has been established by the Legislature, and only that body has the authority to expand it.[50]

[16] If licensed chiropractors, or other credentialed health professionals, think it is appropriate to request an expansion of the scope of practice under Nebraska law, there is a statutory process for doing so.[51] But where, as here, a licensed, credentialed health professional seeks to offer an expert opinion regarding a patient's diagnosis, it is entirely appropriate to limit such expert testimony to matters within the scope of the expert's professional licensure and credentialing.

The trial court did not err in finding that McClaren's additional education did not qualify him to testify as an expert on a matter outside the scope of chiropractic practice. Nor was there any abuse of discretion in excluding McClaren's proffered opinion on the basis it was outside the scope of chiropractic practice in Nebraska.

Lastly, because we find McClaren's testimony regarding the diagnosis of traumatic brain injury was properly excluded

[50] See *Harvey, supra* note 17, 96 Neb. at 789, 148 N.W. at 926 (recognizing Legislature has power to amend laws regulating practice of medicine if those laws are considered "harsh, unjust or impolitic" to professionals practicing chiropractic).

[51] See, e.g., Neb. Rev. Stat. §§ 71-6221(3) and 71-6223 (Reissue 2018).

on grounds it fell outside the scope of chiropractic practice in Nebraska, we do not address the district court's analysis under the *Daubert*/*Schafersman* framework.[52]

## V. CONCLUSION

For the foregoing reasons, the order of the district court is affirmed.

Affirmed.

---

[52] See *Doty v. West Gate Bank*, 292 Neb. 787, 874 N.W.2d 839 (2016) (appellate court not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).