Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/14/2023 09:06 AM CDT

LINDA J. ANGEL, INDIVIDUALLY AND AS SPECIAL
ADMINISTRATOR OF THE ESTATE OF KENNETH
D. ANGEL, DECEASED, AND ANGELS', INC.,
APPELLANTS, v. NEBRASKA DEPARTMENT
OF NATURAL RESOURCES, APPELLEE.

___ N.W.2d ___

Filed April 14, 2023.    No. S-22-447.

1. **Immunity: Jurisdiction.** Sovereign immunity is jurisdictional in nature, and courts have a duty to determine whether they have subject matter jurisdiction over a matter.
2. **Jurisdiction.** Subject matter jurisdiction is a question of law.
3. **Statutes: Appeal and Error.** The meaning and interpretation of statutes are questions of law for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.
4. **Summary Judgment: Appeal and Error.** An appellate court reviews a district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.
5. **Statutes: Appeal and Error.** Statutory language must be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.
6. **Statutes: Legislature: Intent.** When construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.
7. **Statutes: Intent.** A court must look at the statutory objective to be accomplished, the problem to be remedied, or the purpose to be served, and then place on the statute a reasonable construction which best achieves the purpose of the statute, rather than a construction defeating the statutory purpose.

8. **Statutes.** It is not within the province of a court to read a meaning into a statute that is not warranted by the language; neither is it within the province of a court to read anything plain, direct, or unambiguous out of a statute.

9. **Statutes: Appeal and Error.** To give effect to all parts of a statute, an appellate court will attempt to reconcile different provisions so they are consistent, harmonious, and sensible, and will avoid rejecting as superfluous or meaningless any word, clause, or sentence.

10. **Waters: Words and Phrases.** The phrase "control and regulation" as used in Neb. Rev. Stat. § 46-1639(1) (Reissue 2021) means general authority over a dam.

11. **Statutes: Immunity.** Statutes in derogation of sovereignty of the State or its subdivisions should be strictly construed in favor of the State.

12. **Summary Judgment: Appeal and Error.** An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

Appeal from the District Court for Holt County: Mark D. Kozisek, Judge. Affirmed.

Michael F. Coyle, Jordan W. Adam, and Karson S. Kampfe, of Fraser Stryker, P.C., L.L.O., for appellants.

Douglas J. Peterson, Attorney General, Justin D. Lavene, and Maegan L. Woita for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

## INTRODUCTION

The failure of a dam following unusual weather events led to the destruction of nearby property and a person's death. The property owners and the decedent's surviving spouse sued the Nebraska Department of Natural Resources (Department) under theories of negligence and nuisance. The district court granted the Department a summary judgment.

Because immunity in the Safety of Dams and Reservoirs Act (Act)[1] barred the claims, we affirm the district court's grant of summary judgment in the Department's favor.

## BACKGROUND

### OVERVIEW OF ACT

In 2005, the Legislature passed the Act.[2] Its stated purposes are "to regulate all dams and associated reservoirs for the protection of public health, safety, and welfare and to minimize the adverse consequences associated with the potential failure of such dams and reservoirs."[3] The Act defines adverse consequences as "negative impacts that may occur upstream, downstream, or at locations remote from the dam, including, but not limited to, loss of human life, economic loss including property damage, and lifeline disruption."[4]

Under the Act, dams in Nebraska are classified according to their hazard potential.[5] The classification is based on "the degree of incremental adverse consequences of a failure or misoperation of a dam."[6] The hazard potential classification "does not reflect on the current condition of a dam, including, but not limited to, safety, structural integrity, or flood routing capacity."[7]

A dam is classified as either high hazard potential,[8] significant hazard potential,[9] low hazard potential,[10] or minimal

---

[1] Neb. Rev. Stat. §§ 46-1601 to 46-1670 (Reissue 2021).

[2] See 2005 Neb. Laws, L.B. 335.

[3] § 46-1635.

[4] § 46-1604.

[5] See § 46-1618.

[6] *Id.*

[7] *Id.*

[8] § 46-1619.

[9] § 46-1632.

[10] § 46-1621.

hazard potential.[11] Under a high hazard potential classification, "failure or misoperation of the dam resulting in loss of human life is probable."[12] In contrast, a significant hazard potential classification is appropriate when "failure or misoperation of the dam would result in no probable loss of human life but could result in major economic loss, environmental damage, or disruption of lifeline facilities."[13]

A dam's hazard potential classification affects the frequency of inspections and the requirement of an emergency action plan. A high hazard potential dam is inspected by the Department annually, and a significant hazard potential dam is inspected biennially.[14] The owner of a high hazard potential dam must "develop and periodically test and update an emergency action plan to be implemented in the event of an emergency involving such dam."[15] With a significant hazard potential dam, the Department may require the owner to develop such a plan.[16]

Under the Act, the owner of a dam has the primary responsibility for determining when an emergency exists.[17] "The owner shall immediately notify any persons who may be endangered if the dam should fail, notify emergency management organizations in the area, take necessary remedial action to prevent or mitigate the consequences of failure, and notify the department."[18] Under some circumstances, the Department shall take any remedial action necessary to protect life and property.[19]

---

[11] § 46-1623.

[12] § 46-1619.

[13] § 46-1632.

[14] § 46-1664(1).

[15] § 46-1647(1).

[16] *Id.*

[17] § 46-1665(1).

[18] *Id.*

[19] *Id.*

The Act provides immunity from liability in the event of a dam's failure. Under § 46-1639(1), "[n]o action shall be brought against the state, the department, or its agents or employees for the recovery of damages caused by the partial or total failure of any dam by reason of control and regulation thereof pursuant to the . . . Act . . . ." But this immunity does not extend to the owner or operator of a dam: "The . . . Act does not relieve an owner or operator of a dam of the legal duties, obligations, or liabilities incident to the ownership or operation of the dam."[20]

## SPENCER DAM

Spencer Dam (Dam) is a dam[21] located on or near the Niobrara River, the main channel of which forms the boundary between Holt and Boyd Counties in Nebraska. The Dam was originally constructed in the 1920s by Northern Nebraska Power Company. The Nebraska Department of Public Works approved the plans for construction of the Dam. Since 1970, the Nebraska Public Power District (NPPD) has owned, operated, and managed the Dam. NPPD is responsible for the maintenance and design of the Dam.

Over time, the Dam suffered a number of failures and incidents. It failed twice in the 1930s. One incident occurred in March 1935, when a large section of the dike breached after a log and ice jam formed. The Dam was reconstructed in the 1940s. In the 1960s, it suffered flood and ice damage and erosion of the downstream side of the embankment.

## NEARBY PROPERTY

Linda J. Angel, Kenneth D. Angel, and Angels', Inc., owned property to the east of the Dam. The property included a house, a saloon, and a campground. The property was between the Dam's earthen dike and a highway.

---

[20] § 46-1639(2).

[21] See § 46-1611.

2019 DAM FAILURE

On March 12, 2019, the Governor of Nebraska issued a proclamation declaring that a state of emergency existed in Nebraska due to unusual weather events. It referenced severe ice buildup in Nebraska rivers and weather predictions indicating a variety of storm conditions—including flooding—over the next few days.

On March 14, 2019, the Dam failed. It failed at the concrete dam, as well as the earthen dike.

Prior to the Dam's failure, the Department did not receive notice from the Nebraska Public Power District (NPPD) or anyone else that an emergency existed at the Dam. Nor was it informed that NPPD employees were opening "tainter gates and stoplog bays."

Following the Dam's failure, a new channel of the Niobrara River went through the nearby property. Kenneth was never found; a court entered an order declaring him deceased and directing issuance of a death certificate showing the cause of death as drowning on March 14, 2019.

An independent investigative panel of the Association of State Dam Safety Officials examined the Dam's failure. The panel's report stated that based on the documentation provided, the Dam appeared to have been well maintained. According to the "Executive Summary" of the report:

> The flood of water and ice greatly exceeded the capacity of the dam and its spillways. In the panel's opinion, there was nothing the operators at the dam could have done the morning of the flood that would have kept the dam from failing given the magnitude of the flood and ice run.

The panel identified two human factors contributing to the Dam's failure and consequences. One was "a notable lack of knowledge about ice-run-related potential failure modes generally in the dam safety industry." The other was that

"[the Nebraska Dam Safety Program] and NPPD underestimated the potential of the dam to cause life-threatening flooding at the downstream house and property in the event of dam failure."

## Department's Responsibilities

Under the Act, the Department has authority to regulate the over 2,900 dams in Nebraska, including the Dam. As part of the Department's regulation of dams, it conducts safety inspections.

The Department, or its predecessor, conducted safety inspections of the Dam from 1967 to 2018. In 1989, the Department recommended repair of deterioration and other maintenance issues. The record shows that after the effective date of the Act, the Department inspected the Dam in 2008, 2009, 2012, 2015, and 2018.

Prior to the Dam's failure, the last safety inspection occurred in April 2018. The "Dam Inspection Checklist" identified several deficiencies requiring attention: spalling, cracking, or scaling of the principal spillway inlet and outlet; a rodent hole on the downstream slope; and seepage or boils on the downstream slope. The checklist assessed the Dam's condition as "Fair-Deficiencies exist which could lead to dam failure during rare, extreme storm events." An NPPD dam safety engineer who participated in the inspection reported in an email that "the dam was in good shape with no major items of concern."

The Department also has the responsibility to rate the hazard potential of dams. The Department classified the Dam as a significant hazard potential dam. It did not require NPPD to develop an emergency action plan for the Dam, and the Dam did not have such a plan. There are over 200 dams with a significant hazard rating, and the Department has not required an emergency action plan for any of them.

Lawsuit

Linda, individually and as special administrator of Kenneth's estate, and Angels' (collectively the Angels) sued the Department. They alleged that the negligence of the Department and its predecessor agencies caused the Dam's failure and interfered with their use and enjoyment of their property. The Department's responsive pleading asserted immunity as an affirmative defense.

The Angels also sued NPPD, the Dam's owner and operator. They reached a settlement, and the court accepted their stipulation to dismiss NPPD from the action with prejudice.

The Department moved for summary judgment. It asserted that the district court lacked subject matter jurisdiction because the claims were barred by the Department's immunity set forth in the Act and by exceptions in the State Tort Claims Act.[22]

An expert retained by the Angels opined to a reasonable degree of engineering and scientific certainty that the Dam failed because "it was not constructed, maintained, inspected, tested, or operated to withstand reasonably foreseeable weather events." He opined that the Department knew or should have known that an early spring flood could breach the Dam's dike. He further opined that the Department knew or should have known that failure of the Dam would endanger the lives of any person present on the Angels' property, which was located downstream from the dike. According to the Angels' expert, the Dam's hazard potential was incorrect, because it was clearly a high hazard potential dam. He cited the independent investigative panel's report, which stated that "[b]ecause the homeowner's property was just 1/3 mile downstream from the dam, the Panel believes that the dam was misclassified, and it should have been classified as a [h]igh hazard potential dam."

---

[22] See Neb. Rev. Stat. §§ 81-8,209 to 81-8,235 (Reissue 2014 & Cum. Supp. 2022).

DISTRICT COURT'S ORDER

The court entered summary judgment in the Department's favor. It determined that the Department had immunity under the Act "except in very limited circumstances." The court stated that the Angels sought damages for negligence by the Department in classifying the Dam's hazard potential, which the court stated was a regulatory action. The court observed that the Angels' claims were barred if the Department did not assume control of the Dam during an emergency. The court noted that the Angels focused on what the Department did or did not do before and after the dam failure, but not on what it did or did not do during the emergency.

The court reasoned that the "control" contemplated by the Act was more fully explained by § 46-1665, which described remedial actions that the Department might take to protect life and property during an emergency. The court reasoned that control referred to in §§ 46-1636 and 46-1665 "encompasses the transfer of power and control of the operation of the dam to the [Department] temporarily until the emergency has passed." It further reasoned that the hazard classification of a dam "has no connection to operational control over a dam that may be taken by the [Department] in an emergency." The court determined that the immunity in the Act barred all of the Angels' claims and that it did not need to consider the State Tort Claims Act.

The Angels appealed, and we granted their petition to bypass review by the Nebraska Court of Appeals.

ASSIGNMENT OF ERROR

The Angels assign six errors which, consolidated and restated, allege that the district court erred in finding that their claims were barred by immunity in § 46-1639(1).

STANDARD OF REVIEW

[1,2] Sovereign immunity is jurisdictional in nature, and courts have a duty to determine whether they have subject

matter jurisdiction over a matter.[23] Subject matter jurisdiction is a question of law.[24]

[3] The meaning and interpretation of statutes are questions of law for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.[25]

[4] An appellate court reviews a district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.[26]

## ANALYSIS

The Angels argue that their claims are not barred by § 46-1639(1) for three reasons. Before discussing the Angels' arguments, we set forth the immunity statute and recall the principles of statutory interpretation and construction that will guide our analysis.

### Immunity Statute

We set forth the immunity statute in full. Section 46-1639 provides:

(1) No action shall be brought against the state, the department, or its agents or employees for the recovery of damages caused by the partial or total failure of any dam by reason of control and regulation thereof pursuant to the Safety of Dams and Reservoirs Act, including, but not limited to, any of the following:

(a) Design and construction application approval of the dam or approval of interim flood routing plans during construction, reconstruction, enlargement, alteration, breach, removal, or abandonment;

---

[23] *Schaeffer v. Frakes*, 313 Neb. 337, 984 N.W.2d 290 (2023).

[24] *Id.*

[25] *Childs v. Frakes*, 312 Neb. 925, 981 N.W.2d 598 (2022).

[26] *Avis Rent A Car Sys. v. McDavid*, 313 Neb. 479, 984 N.W.2d 632 (2023).

(b) The issuance or enforcement of orders relative to maintenance or operation of the dam;

(c) Control and regulation of the dam;

(d) Measures taken to protect against failure of the dam during an emergency, except for negligent acts of the department in assuming control of a dam during an emergency; or

(e) Failure to act.

(2) The Safety of Dams and Reservoirs Act does not relieve an owner or operator of a dam of the legal duties, obligations, or liabilities incident to the ownership or operation of the dam.

At oral argument, the Department characterized § 46-1639 as a grant of immunity, but also conceded that the Legislature was implementing the constitutional provision, stating that the state "may sue and be sued," and empowering the Legislature to "provide by law in what manner and in what courts suits shall be brought."[27] It has been observed that immunity under one statute does not necessarily indicate that an action will be barred under another statute with a differing scheme.[28] Here, we need not consider any other statutory scheme or whether the Department's terminology regarding § 46-1639(1) is precisely correct. No matter how the Act might be categorized, it controls the decision here.

## PRINCIPLES OF STATUTORY INTERPRETATION AND CONSTRUCTION

[5-7] Statutory language must be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which

---

[27] Neb. Const. art. V, § 22.

[28] See *Dion v. City of Omaha*, 311 Neb. 522, 973 N.W.2d 666 (2022) (Miller-Lerman, J., concurring in part, and in part dissenting) (citing *Davis v. Harrod*, 407 F.2d 1280 (D.C. Cir. 1969)).

are plain, direct, and unambiguous.[29] When construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.[30] A court must look at the statutory objective to be accomplished, the problem to be remedied, or the purpose to be served, and then place on the statute a reasonable construction which best achieves the purpose of the statute, rather than a construction defeating the statutory purpose.[31]

[8,9] It is not within the province of a court to read a meaning into a statute that is not warranted by the language; neither is it within the province of a court to read anything plain, direct, or unambiguous out of a statute.[32] To give effect to all parts of a statute, an appellate court will attempt to reconcile different provisions so they are consistent, harmonious, and sensible, and will avoid rejecting as superfluous or meaningless any word, clause, or sentence.[33]

We now turn to the Angels' arguments asserting that the Department does not have immunity under § 46-1639(1).

## Pre-Act Conduct

First, the Angels contend that the Department is not immune for any of its negligent conduct committed before the effective date of the Act. They assert that before § 46-1639(1) became effective on September 4, 2005, "no statute granted [the Department] statutory immunity for its acts and omission[s]."[34] Based on this premise, they reason that § 46-1639(1) did not preclude their action. We disagree.

---

[29] *Timothy L. Ashford, PC LLO v. Roses*, 313 Neb. 302, 984 N.W.2d 596 (2023).

[30] *Id.*

[31] *Id.*

[32] *County of Lancaster v. County of Custer*, 313 Neb. 622, 985 N.W.2d 612 (2023).

[33] *Yagodinski v. Sutton*, 309 Neb. 179, 959 N.W.2d 541 (2021).

[34] Brief for appellants at 17.

The language of the Act provides no support for the Angels' assertion. To start, the Act contains no temporal limitation with respect to its general applicability. The Legislature knew that hundreds, if not thousands, of dams had already been constructed in Nebraska by the time of the Act's passage in 2005. And two statutes specifically address matters occurring "prior to September 4, 2005."[35] Section 46-1639 is not one of those statutes. If the Legislature wished to exclude from immunity any negligent conduct concerning control and regulation of a dam occurring prior to the effective date of the Act, it could have done so.

Nor is the Angels' argument buttressed by the plain language of the immunity statute. Section 46-1639(1) provides that "[n]o *action* shall be brought against the state, the department, or its agents or employees for the recovery of damages caused by the partial or total failure of any dam by reason of control and regulation thereof pursuant to the [Act]." (Emphasis supplied.) The statute does not differentiate between conduct occurring before or after the Act's existence.

Here, the Angels brought an action against the Department for damages caused by the Dam's failure in March 2019. The failure occurred over a decade after the Act became law. Because the Dam failed after the Act became effective, the Act applies. This assignment of error lacks merit.

CONTROL AND REGULATION

Second, the Angels argue that § 46-1639(1) does not provide the Department with immunity, because the Department's acts and omissions were not "by reason of control and regulation" of the Dam. In making their argument, the Angels look at the words "control" and "regulation" separately and ascribe meanings to the terms that do not fit with the Act's purpose. They argue that as used in § 46-1639(1), "regulation"

---

[35] §§ 46-1655(3) (fees and applications for approval) and 46-1670(1) (application for approval of completed dam).

means "promulgation of formal rules" and "control" means the Department's "performing any operational act at a dam."[36] The Angels' reading disregards several of our principles of statutory interpretation and construction.

[10] Applying our guiding principles, we reach a different interpretation. We must give effect to the purpose of the Legislature, and the Legislature explicitly stated that it intended the Act "to regulate all dams . . . for the protection of public health, safety, and welfare."[37] Because the Legislature used the phrase "control and regulation" in § 46-1639(1), we read those terms together as referring to general authority[38] over a dam.

Dictionary definitions show that "control" and "regulate" are essentially synonymous. Although the Department relies upon a different dictionary,[39] it correctly observes that definitions of the words "control"[40] and "regulate"[41] cross-reference one another. This commonly occurs in the English language.[42]

---

[36] Brief for appellants at 23.

[37] § 46-1635.

[38] See, e.g., *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 37 N.W.2d 502 (1949) (jurisdiction to regulate and control common carriers); *In re Yellow Cab & Baggage Co.*, 126 Neb. 138, 253 N.W. 80 (1934) (general control and regulation of operation of taxicabs).

[39] See brief for appellee at 21, quoting definitions of "control" and "regulate" from Webster's New World College Dictionary (5th ed. 2014).

[40] "Control," Oxford English Dictionary Online, https://www.oed.com/view/Entry/40563 ("to regulate or govern"; borrowing from French) (last visited Apr. 7, 2023).

[41] "Regulate," Oxford English Dictionary Online, https://www.oed.com/view/Entry/161422 ("[t]o control, govern, or direct, esp. by means of regulations or restrictions"; borrowing from Latin) (last visited Apr. 7, 2023).

[42] See *Kohlbrand v. Ranieri*, 159 Ohio App. 3d 140, 823 N.E.2d 76 (2005); Britt Hanson, *A (Mostly) Succinct History of English Legal Language*, 48 Arizona Attorney 28 (2012); and Rabb Emison, *How Will They Know We're Lawyers?*, 48 Res Gestae 46 (2005) (all discussing use of French and English legal words following Norman Conquest).

Having settled that "control and regulation" used in § 46-1639(1) means general authority over a dam, we return to the Angels' second argument. They contend that the Department's alleged negligent acts did not fall within its control and regulation of the dam or within the conduct listed in the subsections of § 46-1639(1). The Angels urge a narrow interpretation and contend that duties like inspections and determining hazard potential classifications would not fall within the listed conduct. We disagree.

[11] The Angels' narrow focus on the listed conduct is inconsistent with the statutory language. Section 46-1639(1) explicitly states that "control and regulation [under the Act] includ[es], but [is] not limited to, any of the following":

(a) Design and construction application approval of the dam or approval of interim flood routing plans during construction, reconstruction, enlargement, alteration, breach, removal, or abandonment;

(b) The issuance or enforcement of orders relative to maintenance or operation of the dam;

(c) Control and regulation of the dam;

(d) Measures taken to protect against failure of the dam during an emergency, except for negligent acts of the department in assuming control of a dam during an emergency; or

(e) Failure to act.

The Legislature included a nonexhaustive list of actions along with the failure to act. By doing so, the Legislature must have envisioned other regulatory-type actions to fall within the immunity provision. Moreover, the Angels' narrow interpretation would conflict with the principle that statutes in derogation of sovereignty of the State or its subdivisions should be strictly construed in favor of the State.[43]

The Angels claim that the Department was negligent in approving revised plans to reconstruct the Dam. But

---

[43] See *Jill B. & Travis B. v. State*, 297 Neb. 57, 899 N.W.2d 241 (2017).

approval of plans is part of the Department's regulatory duties.[44] The Angels also contend that the Department was negligent in operating, maintaining, or managing the Dam. But NPPD—not the Department—was the Dam's owner and was responsible for the operation, maintenance, and management of the Dam. The Department has responsibilities to conduct inspections to determine a dam's safety[45] and to issue notices of violation and/or orders requiring the owner to take some action.[46] But these are actions of control and regulation and fall within the examples of actions covered by immunity in § 46-1639(1): "[d]esign and construction application approval of the dam,"[47] "issuance or enforcement of orders relative to maintenance or operation of the dam,"[48] and "[c]ontrol and regulation of the dam."[49]

The Angels assert that the Department was negligent in determining the Dam's hazard potential classification and in not requiring an emergency action plan. Again, these fall within the Department's control and regulation. A higher hazard potential generally leads to greater regulation.[50] The Department has immunity for its action or inaction in this regard.

In sum, the Department's actions (or failures to act) upon which the Angels base their suit are regulatory in nature. In addition to the alleged failures to act that we have already mentioned, the Angels also contend that the Department was negligent in failing to train or supervise its agents and employees. To the extent their claims were premised upon

[44] See §§ 46-1646(1), 46-1652, 46-1653, and 46-1654.

[45] See § 46-1664.

[46] See §§ 46-1647(4), 46-1653(5) and (6), 46-1662(2) through (4), 46-1663, and 46-1665.

[47] § 46-1639(1)(a).

[48] § 46-1639(1)(b).

[49] § 46-1639(1)(c).

[50] See, e.g., §§ 46-1647 and 46-1664.

the Department's or its agents' or employees' failure to do something, § 46-1639(1)(e) provides immunity due to "[f]ailure to act" in control and regulation of the Dam.

## Negligent Acts in Assuming Control During Emergency

Finally, the Angels argue that the Department's conduct fell within an exception to immunity. Section 46-1639(1)(d) provides immunity for "[m]easures taken to protect against failure of the dam during an emergency" but excepts from that immunity "negligent acts of the department in assuming control of a dam during an emergency." The Angels assert that the exception includes the Department's negligent inspections and adjudications of hazard potential and its continued negligence within the scope of that assumed control. We disagree with their strained interpretation, which fails to strictly construe statutes in derogation of sovereignty.

To understand this exception, one must understand the Act's definition of an emergency. "Emergency includes, but is not limited to, breaches and all conditions leading to or causing a breach, overtopping, or any other condition in a dam that may be construed as unsafe or threatening to life."[51] A breach is a dam failure; it is defined as "partial removal of a dam creating a channel through the dam to the natural bed elevation of the stream."[52]

A statute specifically addresses emergency actions involving a dam. Under § 46-1665(1), a dam's owner has primary responsibility for determining when an emergency exists. That statute further identifies responsibilities for the owner to take and remedial actions for the Department to take under certain circumstances. It should go without saying that the Department must first be aware that an emergency exists before it must take remedial action.

---

[51] § 46-1615.

[52] § 46-1609.

Section 46-1665 elaborates on the Department's duties in an emergency. Section 46-1665(1) identifies when the Department must take remedial action. Section 46-1665(2) specifies actions the Department may take in applying remedial means in an emergency. Those actions include "[t]ak[ing] full charge and control of any dam."[53] Section 46-1665(3) provides that the Department "shall continue in full charge and control of such dam and its appurtenant works until they are rendered safe or the emergency occasioning the action has ceased and the owner is able to take back full charge and control."

Returning to the language of the exception, it applies when the Department commits negligent acts in assuming control of a dam during an emergency. Here, the Department did not become aware of the Dam's failure or the conditions leading to the failure until after it had been breached. The Angels' allegations of negligence are not based on any acts or omissions during an emergency. Because the Department did not assume control of the Dam during an emergency, the exception to immunity in § 46-1639(d) does not apply.

### Sᴜᴍᴍᴀʀʏ Jᴜᴅɢᴍᴇɴᴛ

[12] An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[54] Here, the district court granted judgment in the Department's favor after determining that immunity under § 46-1639(1) barred the Angels' claims. Because we agree that the pleadings and evidence show that the Department had immunity under § 46-1639(1), it was entitled to judgment as a matter of law.

---

[53] § 46-1665(2)(a).

[54] *Hoagbin v. School Dist. No. 28-0017*, 313 Neb. 397, 984 N.W.2d 305 (2023).

## CONCLUSION

The March 14, 2019, failure of the Dam resulted in a tragic loss of life and property. But the Act imposes responsibility for that loss upon the Dam's owner and operator—NPPD—and immunizes the Department from liability for that loss. The policy choices underlying this result were selected by the Legislature, and it is not our role to substitute different policies for those selected by the people's elected representatives. While we sympathize with the Angels for their losses, we conclude that the Act provided the Department with immunity for the claims asserted against it. Because the Department was entitled to judgment as a matter of law, we affirm the district court's grant of summary judgment in the Department's favor.

Affirmed.