IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF D.I.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF D.I., ALLEGED TO BE A DANGEROUS SEX OFFENDER.

D.I., APPELLANT,

V.

MENTAL HEALTH BOARD OF THE FOURTH JUDICIAL DISTRICT, APPELLEE.

Filed June 28, 2022.    No. A-21-1012.

Appeal from the District Court for Douglas County: TODD O. ENGLEMAN, Judge. Affirmed.

D.I., pro se.

Donald W. Kleine, Douglas County Attorney, and Erin K. Hurley for appellee.

PIRTLE, Chief Judge, and BISHOP and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

D.I., pro se, appeals the decision of the Douglas County District Court affirming the order of the Mental Health Board of the Fourth Judicial District (the Board). The Board found that D.I. remains a dangerous sex offender and that secure inpatient treatment remains the least restrictive treatment alternative. We affirm the judgment of the district court.

## II. BACKGROUND

D.I. was convicted of sexual assault of a child in 2004 after he administered bare-bottom spankings and back and buttocks massages to a child. See *In re Interest of D.I.*, 281 Neb. 917, 799 N.W.2d 664 (2011) (*D.I. I*). D.I. was adjudged to be a dangerous sex offender and committed to secure inpatient sex offender treatment in 2006. See, *id.*; *In re Interest of D.I.*, No. A-18-237, 2018

- 1 -

WL 6839726 (Neb. App. Dec. 31, 2018) (selected for posting to court website) (*D.I. II*). He was alleged to have sexually assaulted several male children between the ages of 8 and 14 with whom he had contact through his positions as counselor and director of a church-sponsored Bible camp. See, *D.I. I*; *D.I. II*. D.I. was diagnosed as having two mental illnesses: "pedophilia, sexually attracted to males, nonexclusive type," and "narcissistic personality disorder." *D.I. II*, 281 Neb. at 919, 799 N.W.2d at 667.

According to D.I.'s brief on appeal, he was charged with five counts of sexual assault of a child, but was convicted of one count for which he was sentenced to 5 to 5 years' imprisonment; he claims that he was found not guilty of a second count and that three other counts were dismissed by the prosecutor. D.I. asserts that in 2006 the county attorney's office for Douglas County filed a petition before the Board alleging D.I. was a dangerous sex offender; the Board ruled that he was. According to D.I., he challenged his commitment by way of review hearings in November 2009, March 2016, and July 2017.

In the current proceedings, D.I., pro se, filed a motion for review hearing pursuant to Neb. Rev. Stat. § 71–1219 (Reissue 2018), before the Board on November 20, 2020; he sought "discharge from commitment."

At the review hearing on January 14, 2021, exhibit 3, the progress report and treatment plan from June 2020, was received into evidence over D.I.'s foundation objection. Exhibit 2, the Board's approval of the June 2020 treatment plan, and exhibit 1, D.I.'s November 2020 motion for a review hearing, were received into evidence without objection.

Dr. Shannon Black testified that she is the program director and clinical psychologist at the Lincoln Regional Center (LRC) sex offender program and psychiatric transition program. She provides oversight and supervision "including program development, group activities, clinical meetings, discuss cases, participate in treatment plan reviews, treatment creation, decisions regarding discharge and risk assessment to help . . . in forming decisions relative in discharge."

Dr. Black was familiar with D.I. because he had been a patient in the LRC sex offender program since February 5, 2020. He was previously committed to the Norfolk Regional Center (NRC), "our admissions unit for the sex offender program," under the "Dangerous Sex Offender Act"; his commitment occurred after his 2004 conviction for sexual assault on a child. He had a diagnosis of "paraphilia, not otherwise specified and it's been identified as a rule-out of . . . pedophilia."

Dr. Black had, among other things, reviewed D.I.'s criminal record and his records from the department of correctional services and NRC; she relied on those records for the purposes of treatment and diagnosis. She had also spoken with D.I. "in terms of why he was convicted and . . . his version of events." As a result, she was aware of the facts from the 2004 conviction. She recounted the facts as follows:

> [D.I.] was convicted of sexual assault on a child, after allegations were made, that he had sexually assaulted a minor male, and through the course of investigation, identified that -- that he had touched these children in a sexual way on their -- underneath their clothing, on their buttock, and that they had -- had contact with him in a sexual manner.

According to Dr. Black, the sex offender program is based on a level system, and the levels were modified "a little over a year ago." She explained:

[W]e used to have Levels 1, 2, and 3 in Norfolk, and Levels 1, 2, and 3 and then 4 and 5 in Lincoln.

And it was confusing because people were saying, you know, we're starting at 3, and then we go back to 1. So to . . . make it more . . . easily understood, we actually now go from Level 1 through 7. So patients generally are doing Level 1 through 3 [in Norfolk].

Once they're getting into Level 4, they . . . transfer to Lincoln. Levels 4, 5, and 6, which is where the patient resides, and where we're focused specifically on really looking at sexual assault pattern, risk management strategies, . . . trying to look at patients' understanding of their sexual history, their . . . sexual assault cycles, learning to identify what risk factors they have, creating or identifying -- learning new coping skills to try . . . alternative strategies to dealing with those risk factors, until they reach a point that they're determined to be appropriate to be considered for the transition program.

Then a risk assessment is done, and there's a -- what we call a multidisciplinary staffing where each of the disciplines provides their input on the patient's readiness to move into that transition program. Once they do that, then it's a continuation of Level 6 and 7.

The levels are based on specific areas that we look at in terms of things like their deviant sexual arousal, their risk management strategies, their acceptance of responsibility, their identification of a need for change, and . . . how they're implementing those strategies.

When they get into the transition program, we're also looking at things like employment, as those individuals are able to work in the community and . . . reside here, but we want to make sure that they have a balance between that and their treatment.

Dr. Black further explained that the patient is scored every 2 months by their primary therapist, their sex offender group facilitators, and their social worker on "clinical factors." Additionally, the direct care staff scores the patient on things like cooperation with supervision. The composite score is used to determine the level.

Dr. Black testified that when D.I. transferred to LRC in February 2020, he "came in as a Level 4." At the time of the review hearing, he was still at a Level 4 and had been committed for approximately 14 years. According to Dr. Black, it is not typical for a patient to be committed for that long, but D.I. has been slow to progress through the program because he does not believe there is anything to address.

Dr. Black stated that NRC did a risk assessment for D.I. on January 22, 2020, and because it had only been a couple of weeks, LRC did not redo the risk assessment upon D.I.'s transfer to its facility. She said that D.I. was identified as being in the "above-average risk range on the static [99R]" (not going to change, except based on his age) and in the "moderate risk range on the stable [2007]" (more dynamic factors); the "static 99R" and "stable 2007" "are primary risk assessment instruments used for assessing risk for sex offenders."

Dr. Black stated that D.I.'s risk factors for re-offense are:

[H]is capacity for stable relationships -- because he's not been in . . . an intimate relationship with any partner for more than 2 years and is not currently in a relationship. We also identified emotional identification with children, lack of concern for others for

problem-solving, negative emotionality, deviant sexual preference, and cooperation with supervision.

And then in terms of the static items . . . there is[] having an unrelated victim, having male victims, having prior sex offense charges, and also . . . having never lived with an . . . intimate partner for two years or more.

In addition to Dr. Black, D.I.'s treatment team at LRC includes a primary therapist, a social worker, sex offender group facilitators, a psychiatrist, a nurse, and therapeutic recreation staff. At LRC, patients are assigned to a sex offender group that they attend a minimum of four times a week, and the patient may attend other groups (e.g. anger management, substance abuse, assertiveness skills, arousal reconditioning) as needed; each treatment plan is individualized. The patient is also involved in therapeutic recreational activities, both physical and nonphysical, to expand leisure skills and maintain a healthy, balanced lifestyle. If necessary, the patient may also have medical treatments specific to any medical diagnoses.

Dr. Black stated that D.I. portrayed the behavior that led to his conviction as "spank[ing] a child on their . . . bare bottom, not with any sexual intent." Because D.I. repeatedly denied that there was any sexual intent, denied that he committed any crime, and did not perceive that he needed treatment, Dr. Black tried to "find some common ground as to where we could focus on treatment, recognizing that we're not going to retry his case one way or the other." She said,

[W]e . . . have asked him to at least talk about the behavior that led to the conviction, what he's learned in treatment, and to try and identify potential high-risk situations that . . . could even result in allegations of sexual assault, and develop some strategies to manage that. And that's the language we use in his treatment plan.

Again, because he denies that there was anything sexual, he doesn't perceive that he was in a high-risk situation, beyond spanking this child without the parents' permission and they're reacting to that. So he doesn't perceive that this is behavior he needs to change, but rather focuses on that he was basically wrongly convicted and that it was blown out of proportion.

So without him being willing to discuss any of those factors, it's difficult for us to, you know, identify that he's made much progress.

As part of her work as a clinical psychologist at LRC and part of D.I.'s treatment team, Dr. Black provided the Board with a treatment progress report, exhibit 3, dated in June 2020. When asked why LRC provides treatment plan updates, Dr. Black responded,

Well, one, it's statutorily required, and, two, just to make sure that we're communicating with the mental health board, relative to that person's progress, in case there would be a need to change that person's status from an inpatient or an outpatient to our discharge so that they are aware of what we are doing with that individual and what that patient's progress is[.]

Dr. Black was asked if, in her opinion and to a reasonable degree of psychological certainty, D.I.'s mental illness had been successfully treated or managed to the extent that he no longer posed a threat to the public. She replied, "I do not believe so," and explained:

Again, because there really hasn't been any significant change. [D.I.] has consistently identified that . . . he didn't do anything wrong, and therefore there's nothing to change. And other than identifying that he would not spank a person's child without their permission, . . . he doesn't really identify a need to put much, relative to safety, factors in place in terms of being alone with children . . . and just doesn't see those . . . as issues and doesn't identify any concern relative to the amount of time he spent with children previously.

Additionally, according to Dr. Black, D.I.'s lack of problem-solving and other ways to utilize treatment do not suggest that "significant enough progress has been made."

Dr. Black also opined to a reasonable degree of psychological certainty that D.I. still suffered from the diagnosis (from the psychiatrist) of paraphilia, not otherwise specified, with rule-out pedophilia sexually attracted to males. Dr. Black said that "from a psychological perspective," she diagnosed D.I. with pedophilic disorder, nonexclusive, sexually attracted to males, and a narcissistic personality disorder. Dr. Black further opined to a reasonable degree of psychological certainty that inpatient treatment remained the least restrictive alternative that exists that does not increase the risk that D.I. will commit another sex offense. When asked what the projected timeline was for D.I. to complete the program at LRC, Dr. Black responded, "Well, at the pace he's going, it's going to be a significant length of time" because until he is willing to talk about factors that impact his risk, it is "difficult for us to assess that he actually is ready to go." Assuming that D.I. completes the inpatient program, then "we would update his risk assessment, that's when we would do a multidisciplinary staffing, and the . . . various team members would provide their input of their perception of his appropriateness to be in that transition program and for eventual discharge."

On cross-examination, Dr. Black testified that despite being convicted of sexual assault of a child, there was a discrepancy in terms of how D.I. viewed his behavior and how other people viewed his behavior. D.I. asked Dr. Black if she had any details about his conviction beyond the legal terminology. She responded,

I think that I identified that the . . . allegation was that you had touched the . . . bare buttock of a minor male child. And -- so that would have been the nature of the behavior. There were other allegations from other victims, but I know that you were only convicted of -- although you were charged initially with five counts, you were only convicted of the one[.]

D.I. then inquired about the "other allegations" Dr. Black referenced.

Q [(by D.I.)]. Okay. And where are you -- where's the information coming from about these other allegations that . . . you referenced? In other words, where . . . are you getting these allegations from?

A [(by Dr. Black)]. So from the classification study, which would have also -- from the department of correctional services, which is -- would have been taken from the presentence investigation and your court records.

Q. Okay. And is that the only source that you have?

A. Just the -- the information that we also have from [NRC], which would likely have been the same documentation.

Q. So, again, we're -- we're talking about the classification study.

Is there any other specific document or material of any type that you got this information from?

A. Again, just from the department -- or from the Norfolk Regional Center records, which would have also likely been from similar sources, and let me -- which, again, would have been from the PSI and the -- and the presentence investigation and the classification study from corrections.

Q. . . . [W]hat about police reports? Are you in possession of those?

A. No, I don't have the specific police reports for your case.

D.I. then inquired about his risk factors, specifically his emotional identification with children.

Q. . . . I guess the question I have is, does somebody who works with kids, on a regular basis, also have a risk factor of being emotionally identifying with children[?] . . .
. . . .

A. So the . . . difference is that somebody that may work with children may not have the same perspective of children and of spending more time . . . with children because they perceive children as being less judgmental or more understanding or being easier to relate to than adults, being involved in activities that are more juvenile in nature.

So, it's not just about them working with children, but even -- so if you think of, say, teachers or something like that, there's . . . a boundary of how much time or . . . what contact they have with that child. And those can be violated and generally are problematic in terms of not seeing it as a -- a professional limit -- this is my role. . . . I don't go beyond this role. And . . . that was the identification . . . of the issue.

Q. Okay. And do you have any evidence to back up the fact that I would be doing anything other than relating with kids in this semiprofessional, let's say, a teacher type of relationship?

A. Well . . . the level of involvement that you had with these kids -- and I know that you've identified it as . . . parenting . . . these two boys, but having these two children who aren't yours, taking them for weekends, spending time with lots of children, almost to the exclusion of adults, . . . is not what we would consider in line with a normal boundary with children, you know, and -- so that's part of the reasoning.
. . . .

Q. How do you come to that conclusion?

A. Well, just even in my conversations with you, [D.I.], in terms of the amount of time that you were spending with kids and having them in and out of your house without, you know -- and feeling comfortable enough to spank somebody's children and that they had -- they were in and out of your house as freely as they -- as they were. Quite frankly, that's not a normal interaction that most people have.

There are limits. They identify when kids can be there. . . . [T]here's not this kind of open-door policy, and when there is, then that is then identified . . . as an area that can be extremely risky in terms of boundary violations.

D.I. also noted that the definition of "dangerous sex offender" includes, in part, that the person must be substantially unable to control his or her criminal behavior. He asked Dr. Black if it was her position that he was substantially unable to control his criminal behavior. She responded, "Yes." Her reasoning was

> [b]ased on the fact that you perceive what you did was non-problematic, and are not willing to address safety measures or even really discuss potential options for safety measures beyond not spanking somebody else's child. Doesn't' suggest to me that you would maintain those boundaries, based on what I perceive is your attraction to minor males, based on my definition or my diagnosis of pedophilia and your other diagnosis of paraphilia, not otherwise specified.
>
> . . . .
>
> And part of the diagnosis would be that that impacted -- that that's the basis of the diagnosis, is it creates problems and is not able to be managed such that it doesn't negatively impact other aspects of one's life.

D.I. asked Dr. Black if it was fair to say that he had been in treatment for so many years "merely because I'm denying the criminal offenses that have been alleged against me[?]" She responded,

> Not necessarily. I think it's a matter of not willing to address even -- you know, even in my talking to you, I've even tried to address it from a different perspective of -- at least let's talk about what this -- what got you into this situation that created a situation in which you ended up being convicted on a sexual assault, that you allege that you didn't commit.
>
> Okay. So I can even work from that perspective. But what are you going to do differently so that you don't end up in that position again?
>
> And you're not even really willing to discuss that. That doesn't show me good problem-solving.
>
> . . . .
>
> I think that you've put yourself . . . in a no-win situation by being unwilling to look at things that you could and that you're cable of. . . .
>
> You -- you're definitely smart enough to do this program. There's no doubt in my mind about that, but there is . . . something that says, "I'm not going to have a conversation about any of those things, lest I be perceived as guilty."
>
> You've already been found guilty. That's not our focus.

D.I. testified in his own behalf. He had been working with children in a leadership capacity through his church. D.I. said, "there's also a couple of boys that, in the mid '90's, that were members of my church -- I knew their family very -- very well. We semi-adopted each other. That's what we'll call it." D.I. became a "father figure" to the two boys. He said, "I didn't have any of my own, . . . so they were my children in that sense."

The chairman of the Board asked D.I. if he would try to have boundaries with children if he was out in the community. D.I. responded, "I have so many boundaries with kids. Because apart from my own two kids that I've raised, I don't do anything with them -- as opposed to what has been alleged against me." D.I. continued, stating, "I do not go out seeking other kids. I have not

brought other kids into my sphere," "[a]nd if I was put in the same position that I was before, no, I would definitely not be doing . . . the same thing"; "it was just a flash of temper on my part[,] [i]t was a mistake." The chairman asked D.I. if he told that to the treating team, and he responded, "Over and over and over again." The following discussion was then had between the chairman and D.I.

CHAIRMAN: And did -- are you willing to come up with coping skills and boundaries?

[D.I.]: Over that. However, [the treatment team is] not willing to limit it to that. They want some sort of admission of -- whether direct or indirect, about this larger cloud of allegations that have been brought against me.

. . . .

CHAIRMAN: I mean, if you're not going to spank them, then you're not going to -- then you're going to have boundaries for sexual touching, too, aren't you --

[D.I.]: Well --

CHAIRMAN: -- whether you -- whether you have to fully admit it or not, don't you?

[D.I.]: Yeah, but, again, that's -- by stating that I need to put a boundary suggests that I have a problem with this boundary.

CHAIRMAN: Okay. Okay.

[D.I.]: It's -- it's an indirect admission of guilt.

CHAIRMAN: Right. And you don't want to do that?

[D.I.] And I don't want to do that. I don't need to promise not to rob a bank in order to go banking if I don't have a problem robbing banks.

CHAIRMAN: Okay. Okay.

D.I. denied that he had a narcissistic personality disorder. He also denied responsibility for "the false allegations made against me" at trial.

The State then had the following discussion with D.I.

[The State]: Okay. You've been in treatment for 16 years with the Department of Health and Human Services in Nebraska?

[D.I.]: That's correct.

[The State]: You understand that the doctors and the treatment team [have] adjusted your goals so there doesn't have to be an admission of guilt on your part to move through the program? You understand that; correct?

. . . .

[D.I.]: Yes, as far as that goes.

[The State]: But yet you're not willing to meet with the treatment team and develop a plan so that you're not even accused of these kind of actions going forward in the future; correct?

. . . .

[D.I.]: Okay. Can I just state, though, [the State] just brought up a good point -- was that they changed the -- basically the scope of the Sex Offender Commitment Act to merely

seeking a -- a -- put me in a position to where no accusation can be made again. It's -- the purpose of it is to prevent harm to the public.

And if -- if we're changing the law just to find some palpable way to save face and get me out of there, then I think that's well beyond the scope of what I was there in the first place for. There's no reason to keep me there for that reason.

Upon questioning by another member of the Board, D.I. stated that if he was out in the community, he "wouldn't mind working with kids again" because that is what he enjoys doing. However, D.I. "understand[s] the realities," and "even if [his] conviction somehow got thrown out, . . . the stain is there"; "[t]here's no way in hell [he] would ever be able to work with kids or want to put [himself] in that position again."

After deliberating, the Board orally pronounced its findings.

[W]e're here on a motion for review, which entail the review of the -- current treatment, as well as . . . whether the person -- the subject of this hearing should remain under commitment.

And based on the evidence presented, the Board does find, by clear and convincing evidence, that the subject of this hearing continues to be a dangerous sex offender, as defined under Nebraska Law. The current diagnoses -- mental illness diagnoses are paraphilia -- and then there was the secondary diagnosis -- sometimes referred to rule-out diagnosis of pedophilia, sexually attracted to males.

The Board further finds, by clear and convincing evidence, that without further treatment, the subject would be likely to engage in repeat acts of sexual violence. And there -- there was evidence that the subject had been in treatment for a number of years and, although working on coping skills and boundary issues, still hasn't made it through the sex offender treatment program of the State of Nebraska, and based on that, still has some -- some work to do through the treatment program.

And . . . we did take judicial notice of the original order in this case. That -- that made the findings of the convictions of the sex offenses.

Based on those findings, the Board finds that the least restrictive treatment alternative at this time is inpatient treatment, and, by law, that's through the Nebraska Department of Health and Human Services.

The Board's written order to that effect was filed on January 14, 2021.

D.I. appealed the Board's decision to the district court, which affirmed. D.I. now appeals to this court.

## III. ASSIGNMENTS OF ERROR

D.I. claims that the Board erred by (1) using insufficient, inadmissible, and prejudicial evidence to rule that he is a dangerous sex offender, (2) failing to act as a gatekeeper to ensure the evidentiary relevance and reliability of the expert's opinion, (3) expanding the scope of the Sex Offender Commitment Act "by changing the focus from protecting the public from danger to protecting [D.I.] from future accusations, and by requiring a direct or indirect admission of guilt to unproven and irrelevant allegations," and (4) displaying bias in favor of the State.

## IV. STANDARD OF REVIEW

The district court reviews the determination of a mental health board de novo on the record. *In re Interest of S.J.*, 283 Neb. 507, 810 N.W.2d 720 (2012). In reviewing a district court's judgment, an appellate court will affirm unless it finds, as a matter of law, that clear and convincing evidence does not support the judgment. *Id.*

## V. ANALYSIS

### 1. LEGAL FRAMEWORK OF SEX OFFENDER COMMITMENT ACT

Nebraska's Sex Offender Commitment Act (SOCA) is encompassed in Neb. Rev. Stat. §§ 71-1201 to 71-1226 (Reissue 2018). The purpose of the SOCA is "to provide for the court-ordered treatment of sex offenders who have completed their sentences but continue to pose a threat of harm to others." § 71-1202. Neb. Rev. Stat. § 83-174.01(1) (Reissue 2014) defines a "dangerous sex offender" as

> (a) a person who suffers from a mental illness which makes the person likely to engage in repeat acts of sexual violence, who has been convicted of one or more sex offenses, and who is substantially unable to control his or her criminal behavior or (b) a person with a personality disorder which makes the person likely to engage in repeat acts of sexual violence, who has been convicted of two or more sex offenses, and who is substantially unable to control his or her criminal behavior[.]

"Likely to engage in repeat acts of sexual violence means the person's propensity to commit sex offenses resulting in serious harm to others is of such a degree as to pose a menace to the health and safety of the public." § 83-174.01(2).

If dangerous sex offenders do not obtain voluntary treatment, they "shall be subject to involuntary custody and treatment" following mental health board proceedings as provided by the SOCA. § 71-1202. The SOCA states that if a "subject" (person at issue in SOCA proceeding, see § 71-1203(4)) admits to allegations of a petition or the mental health board finds that the subject is a dangerous sex offender and no other treatment alternatives less restrictive of the subject's liberty than inpatient or outpatient treatment ordered by the board are available or would suffice to prevent the harm described in § 83-174.01(1), then the board shall, within 48 hours, order the subject to receive inpatient or outpatient treatment. See § 71-1209(4). The subject is committed to the custody of the Department of Health and Human Services if inpatient treatment is ordered. See *id.*

A person designated by a mental health board to prepare and oversee a subject's individualized treatment plan must submit periodic reports to the mental health board regarding the subject's progress under the plan and any modifications to the plan. See § 71-1216. Section 71-1219(1) states that upon the filing of such a periodic report, the subject may request a review hearing by the mental health board seeking an order of discharge from commitment or a change in treatment. Section 71-1219(2) states:

> The board shall immediately discharge the subject or enter a new treatment order with respect to the subject whenever it is shown by any person or it appears upon the record of the periodic reports filed under section 71-1216 to the satisfaction of the board that (a) the

subject's mental illness or personality disorder has been successfully treated or managed to the extent that the subject no longer poses a threat to the public or (b) a less restrictive treatment alternative exists for the subject which does not increase the risk that the subject will commit another sex offense. When discharge or a change in disposition is in issue, due process protections afforded under [the SOCA] shall attach to the subject.

The State bears the burden to show by clear and convincing evidence that the subject remains mentally ill and dangerous, and under the plain language of the statute, the board must determine whether the subject's mental illness or personality disorder has been successfully treated or managed; this necessarily requires the board to review and rely upon the original reason for commitment. See *D.I. I*. Once the subject of a petition has exercised his or her right to a review hearing, and asserted that there are less restrictive treatment alternatives available, the State is required to present clear and convincing evidence that a less restrictive treatment alternative is inappropriate. *Id.* At that point, the subject may further rebut the State's evidence. *Id.*

2. EVIDENCE D.I. IS STILL DANGEROUS SEX OFFENDER

D.I. argues that the Board used insufficient, inadmissible, and prejudicial evidence to rule that he is a dangerous sex offender as defined by § 83-174.01.

(a) 2006 Order of Commitment

D.I. claims the Board erred when it took judicial notice of the 2006 order of commitment and claims that the "State was attempting to . . . bypass due process by not offering evidence into the record which could be challenged by [him]." Brief for appellant at 22. However, as we previously stated in *D.I. II*, D.I. can no longer challenge the 2006 order. See *D.I. II* (the record does not indicate D.I. timely appealed from original 2006 commitment order; he cannot now directly challenge the sufficiency of the evidence on which the Board relied for its initial decision in that order). Accordingly, the Board did not err in taking judicial notice of the 2006 order.

(b) Dr. Black

*(i) Expert Witness*

D.I. claims that the Board erred when it "unilaterally upgraded" Dr. Black from a "'lay' witness to an 'expert.'" Brief for appellant at 30.

When the State called Dr. Black to testify, D.I. objected. The following colloquy followed.

[D.I.] . . . I'm assuming that Dr. Black is being called as an expert witness.

[The State]: She's being called as a witness.

[D.I.] As just a witness?

Okay. I'll hold off on that for the time being.

CHAIRMAN [of the Board]: are you withdrawing?

[D.I.] I withdraw my objection.

Dr. Black was then sworn in and direct examination began.

Dr. Black testified regarding her credentials. She has been a licensed psychologist in the state of Nebraska since 1990, and has worked for the State of Nebraska as a clinical psychologist

since January 1995. Dr. Black was originally a psychologist in the department of corrections and was eventually program director there for approximately 4½ years. She served as the clinical director for the Nebraska State Patrol Sex Offender Registry program for 9 years. And she has been in her current role as the program director and clinical psychologist at the LRC sex offender program and transition program for 12 years. Accordingly, she has worked with sex offenders for "26, 27 years."

Dr. Black was familiar with D.I. because he had been a patient in the LRC sex offender program since February 5, 2020, having been transferred there from NRC. Dr. Black had, among other things, reviewed D.I.'s criminal record and his records from the department of correctional services and NRC; she relies on those records for the purposes of treatment and diagnosis. She had also spoken with D.I. and was a member of his treatment team.

When Dr. Black was asked questions specific to D.I.'s case, D.I. objected, stating "she's not testifying as an expert," "[s]he's just a lay witness." The chairman of the board responded, "I don't accept that. I mean, I haven't heard that yet. . . . [S]he seems to be qualified as an expert witness." D.I. then stated, "Well, I think [the State] . . . said . . . that she is not testifying as an expert witness." The chairman responded, "Well, I think she's got the qualification of an expert witness," and allowed the State to proceed with its questioning.

Despite D.I.'s assertion, the State never said that Dr. Black was testifying as a lay witness and not as an expert witness. Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 2016), governs the admissibility of expert testimony and provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Under rule 702, "a witness can testify concerning scientific, technical, or other specialized knowledge only if the witness is qualified as an expert." *Yagodinski v. Sutton*, 309 Neb. 179, 189, 959 N.W.2d 541, 549 (2021). Whether a witness is qualified as an expert is a preliminary question for the trial court. *Id*. Based on our review of the record, the district court did not err in determining that the Board's admission of Dr. Black's testimony was not in error.

### (ii) Dr. Black's Testimony

It is within the trial court's discretion to determine whether there is sufficient foundation for an expert witness to give his or her opinion about an issue in question. *In re Interest of A.M.*, 281 Neb. 482, 797 N.W.2d 233 (2011). Mental health boards must apply the rules of evidence. *Id.* See, also, § 71-1226 (rules of evidence applicable in civil proceedings shall apply at hearings held under SOCA). Under Neb. Evid. R. 703, Neb. Rev. Stat. § 27-703 (Reissue 2016), facts or data an expert relies upon may be "perceived by or made known to him at or before the hearing" and "need not be admissible in evidence" if experts in the field reasonably rely on such facts or data in forming opinions or inferences. But because a SOCA hearing may result in a serious deprivation of the defendant's interest in liberty, the State's evidence must be sufficiently reliable to comply with due process. *In re Interest of A.M., supra*.

The State's evidence consisted of Dr. Black's testimony. We have previously set forth in detail Dr. Black's testimony and opinion regarding D.I. and we will not recount it here.

D.I. asserts that Dr. Black's opinion was based on hearsay and inadmissible evidence, e.g. a classification study that "had already been declared hearsay and inadmissible by the Board at the original 2006 hearing." Brief for appellant at 19. However, the classification study was not mentioned until D.I.'s cross-examination of Dr. Black, and there is nothing in our record, aside from D.I.'s own statement, to show that the classification study had previously been declared inadmissible in 2006. In any event, the sources used by Dr. Black provided the foundation for her testimony and were an exception to the hearsay rule. See Neb. Evid. R. 803(4), Neb. Rev. Stat. § 27-803(4) (Supp. 2021) (statements made for purposes of medical diagnosis or treatment are not excluded by the hearsay rule). Dr. Black stated that she reviewed D.I.'s file which she relied on for the purposes of treatment and diagnosis, and she worked with D.I. and his treatment team since his transfer to LRC on February 5, 2020. The district court did not err in finding that Dr. Black's opinion was supported by facts and data reasonably relied upon by experts in the field and was based on more than mere subjective belief or unsupported speculation. And her testimony was certainly relevant to whether D.I. remained a dangerous sex offender.

(c) Finding D.I. is Dangerous Sex Offender Not Error

As stated previously, § 83-174.01(1)(a) defines a "dangerous sex offender" as "a person who suffers from a mental illness which makes the person likely to engage in repeat acts of sexual violence, who has been convicted of one or more sex offenses, and who is substantially unable to control his or her criminal behavior[.]" D.I. was convicted in 2004 for sexual assault of a child. Dr. Black opined to a reasonable degree of psychological certainty that D.I. still suffered from the diagnosis (from the psychiatrist) of paraphilia, not otherwise specified, with rule-out pedophilia sexually attracted to males. Dr. Black said that "from a psychological perspective," she diagnosed D.I. with pedophilic disorder, nonexclusive, sexually attracted to males, and a narcissistic personality disorder. According to Dr. Black, on the static 99R instrument for assessing sex offenders, D.I. was identified as being in the "above-average risk range" to reoffend; on the stable 2007 instrument he was identified as being in the "moderate risk range" to reoffend. Despite 14 years of commitment, D.I. was still at Level 4 of the sex offender program; progress was slow because he did not believe there was anything to address and was not willing to discuss risk factors and safety measures.

Dr. Black opined that D.I. has not been successfully treated or managed to the extent necessary, and that inpatient treatment remained the least restrictive alternative that exists that does not increase the risk that he will commit another sex offense.

Based on our review of the record, the district court did not err in determining that the State proved by clear and convincing evidence that D.I. remains a dangerous sex offender, his condition had not been successfully treated or managed to the extent necessary, and that continued inpatient treatment is the least restrictive alternative available. See § 71-1219(2) (board shall immediately discharge subject or enter new treatment order whenever (a) subject's mental illness or personality disorder successfully treated or managed to extent subject no longer poses threat to public or (b) a less restrictive treatment alternative exists).

### 3. TREATMENT GOALS

D.I. claims that the Board erred by expanding the scope of the SOCA "by changing the focus from protecting the public from danger to protecting [D.I.] from future accusations, and by requiring a direct or indirect admission of guilt to unproven and irrelevant allegations." We addressed a similar claim in *D.I. II*. In that opinion we found that NRC's decision to change from addressing a subject's denial of past sexual acts or motivations to now requiring only identification of behavioral changes to prevent future accusations of sexual assaults appeared to strike a balance between permitting the subject's claim of innocence and the necessity of the subject recognizing the types of behaviors which trigger the SOCA. We find that same reasoning to be applicable here. Accordingly, the district court did not err when it found that the Board did not change the focus or expand the scope of SOCA.

### 4. NO BIAS

D.I. claims that the Board erred by displaying bias in favor of the State when it allowed Dr. Black to testify as an expert witness, allowed her to testify over his foundation objections, and "limit[ed] the hearing to a referendum on treatment progress rather than an evidentiary hearing." Brief for appellant at 30. We have already addressed the underlying issues of this claim. The district found that "the Board did not display bias or err when it ruled unfavorably against D.I." We agree.

## VI. CONCLUSION

We affirm the judgment of the district court which affirmed the Board's decision denying D.I.'s request for an order of discharge.

AFFIRMED.